**PUBLIC CITIZEN, et al., Appellants,**

**v.**

**OFFICE OF THE UNITED STATES TRADE REPRESENTATIVES,**
**et al., Appellees.**

**No. 92–5010.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 4, 1992.

Decided Aug. 7, 1992.

Patti A. Goldman, with whom Alan B. Morrison and Paul R.Q. Wolfson, were on the brief, for appellants.

Barry M. Hartman, Acting Asst. Atty. Gen., with whom Benedict S. Cohen, Deputy Asst. Atty. Gen., Peter R. Steenland, Jr., and Bradley M. Campbell, Attorneys, Dept. of Justice, and Daniel E. Brinza, Attorney, U.S. Trade Representative, were on the brief, for appellees.

Paul D. Kamenar and Daniel J. Popeo, were on the brief, for amicus curiae urging that this Court affirm the decision of the District Court.

Before: WALD, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHAN F. WILLIAMS, Circuit Judge:

The United States Trade Representative is currently negotiating two trade agreements on behalf of the President: the North America Free Trade Agreement with Canada and Mexico ("NAFTA") and the Uruguay Round of the General Agreement on Tariffs and Trade. Agreement has not been reached on either. Public Citizen, the Sierra Club and Friends of the Earth sued the Trade Representative and the President, claiming that in negotiating such agreements they had failed to prepare the environmental impact statements ("EISs") required by § 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (1988), for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment".[1] The district court dismissed the suit on the ground that the plaintiffs

lacked standing, and also noted ripeness and finality problems. *Public Citizen v. USTR*, 782 F.Supp. 139 (D.D.C.1992). We do not reach standing, but affirm because plaintiffs have failed to identify any "final agency action" judicially reviewable within the meaning of § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704.

\* \* \* \* \* \*

The Trade Representative is responsible for conducting international trade negotiations, developing and coordinating U.S. international trade policy, and imposing retaliatory trade sanctions on other countries. 19 U.S.C. §§ 2171; 2411–2417 (1988). Trade agreements involving nontariff barriers, and bilateral trade agreements involving tariff and/or nontariff barriers, are to take effect only if implementing bills are enacted by both the House of Representatives and the Senate. *Id.* § 2903(a)(1). The approval process takes place on a "fast track": the President must notify Congress at least 90 days before he enters into an agreement, *id.* § 2903(a); once he submits the agreement and the proposed implementing legislation, Congress has 60 days to approve or reject the agreement, *id.* § 2191(c) & (e), and may not amend the implementing legislation, *id.* § 2191(d). Of course, Congress retains the power to modify the fast track rules at any time, as they were adopted pursuant to each house's rulemaking power and thus, by their explicit terms, "with full recognition of the constitutional right of either House to change the rules ... at any time, in the same manner and to the same extent as in the case of any other rule of that House." *Id.* § 2191(a)(2). The fast track procedures were limited to trade agreements entered into before June 1, 1991, but Congress provided for a possible two-year extension. *Id.* § 2903(b)(1). President Bush requested and received such an extension for both the Uruguay Round and NAFTA.[2]

1. Plaintiffs initially requested an injunction preventing defendants from concluding either trade agreement until they prepared EISs, but now seek only an order that the Trade Representative comply with NEPA. See *Public Citizen v. USTR*, 782 F.Supp. 139, 140 (D.D.C.1992).

2. See Report to the Congress on the Extension of Fast Track Procedures, Mar. 1, 1991 (President's request). The extension became effective because neither house adopted a disapproval resolution. 19 U.S.C. § 2903(b)(1)(B); see 137 Cong.Rec. H3588–89 (daily ed. May 23, 1991) (rejecting disapproval resolution); *id.* at S6828–

The President responded to public concern over NAFTA's potential effects on the environment and labor by announcing his intention to prepare a "Border Environmental Plan" before completing an agreement. See Response of the Administration to Issues Raised in Connection with the Negotiation of a North American Free Trade Agreement (May 1, 1991). A plan was issued in draft and, after public comment, in final form. The Trade Representative also coordinated an interagency task force's study of U.S.–Mexico environmental issues that established broad goals for NAFTA negotiators. See Draft Review of U.S.–Mexico Environmental Issues (Oct. 1991); Final Review of U.S.–Mexico Environmental Issues (Feb. 1992).

The Trade Representative maintains she is under no legal obligation to prepare EISs for trade agreements, and has rejected plaintiffs' request to do so here. Plaintiffs claim that the agreements would have various potentially adverse environmental effects, mostly growing out of the agreements' possible preemptive effect on various federal and state environmental regulations. They cited as examples a GATT dispute resolution panel's decision declaring that the Marine Mammal Protection Act impermissibly restricted tuna imports under the current GATT, see GATT Panel Report, *U.S. Restrictions on Imports of Tuna* (1991); food safety harmonization provisions appearing in Uruguay Round drafts; and the chance of increased pollution on the U.S.–Mexico border due to the combination of treaty-inspired faster economic development in Mexico and less strict Mexican environmental standards. The plaintiffs also point to the *possibility* of harmonization provisions in NAFTA, though there are evidently no published NAFTA drafts.

Defendants challenged the district court's jurisdiction, asserting lack of standing and ripeness. They also raised several merits defenses, saying that NEPA is preempted by the fast-track statute; that

NEPA does not bind the Trade Representative or the President, because they are not agencies; and that NEPA's application here would violate the constitutional doctrine of separation of powers. The district court granted the defendants' motion to dismiss the complaint, holding that plaintiffs lacked Article III standing, *Public Citizen v. USTR*, 782 F.Supp. at 141–44, and noting that the controversy was not ripe, *id.* at 142 n. 2. This appeal followed.

\* \* \* \* \* \*

■ NEPA does not create a private right of action, so plaintiffs rest their claim for judicial review on the Administrative Procedure Act, which confers an action for injunctive relief on persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute". 5 U.S.C. § 702. Absent an independent provision for review, however, the APA permits review only of "final agency action". *Id.* § 704; see *Lujan v. National Wildlife Federation*, 497 U.S. 871, ——, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990). As finality is a jurisdictional requirement, see, e.g., *Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975), its absence precludes us from considering the merits, and removes any need for considering the government's other jurisdictional argument, standing.

■ We begin with NEPA itself, for it specifically identifies the time when an agency's action is sufficiently concrete to trigger the EIS requirement. The relevant section tells us that a detailed EIS must be included "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Since the Trade Representative's refusal to prepare an EIS is not itself a final agency action for purposes of APA review, *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C.Cir. 1991), plaintiffs must point to a specific proposal for legislation or other action "at

29 (daily ed. May 24, 1991) (same). No party here suggests that this procedure involved an invalid legislative veto, see *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983),

presumably because the rules of the two houses of Congress are not subject to the requirements of bicameralism and presentment.

least arguably triggering the agency's obligation to prepare an impact statement", *id.*

They are unable to do so here. No final agreement has yet been produced in either the NAFTA or Uruguay Round negotiations, and it is unclear whether either round will *ever* produce a final agreement for the President to submit to Congress. That two draft proposals of the Uruguay Round have been made public does not solve the problem; these are just drafts, and apparently neither of them has resolved the impasse in the negotiations. Cf. *FTC v. Standard Oil Co.*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980) (filing of complaint is not final action, for it serves "only to initiate the proceedings"). As the government points out, the drafts are incomplete on critical issues. In releasing the December 20, 1991 draft on the Uruguay Round, for example, the GATT Secretariat noted that final agreement "will depend on substantial and meaningful results ... in the ongoing market access negotiations" relating to a wide range of issues including agriculture and natural resources. Draft Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, cover page (Dec. 20, 1991). Even as to areas mentioned in the draft, the language is not in final legal form. See *id.*, Annex I n. 1. Furthermore, the areas of tentative consensus themselves are susceptible to change, as "consensus in any one area does not become final unless and until final agreement is reached in all sectors and negotiating groups with all parties". Declaration of Julius L. Katz, Deputy Trade Represent-

ative (in charge of both negotiations), 3–4 (Nov. 14, 1991).

As to NAFTA, plaintiffs seek to rely on the President's Draft Review of NAFTA environmental issues. But that merely makes broad recommendations about environmental issues that negotiators should consider; it falls far short of being even a draft of a possible agreement.

Thus, plaintiffs have not identified any final agency action. Indeed at oral argument their counsel recognized that there would be none until actual completion of a trade agreement.[3] Rather, they invite us to intervene prematurely, on the ground that the Trade Representative has already stated that she will not prepare EISs, and that EISs would most usefully inform the decisionmaking process if prepared while negotiations are taking place, or at the latest by the time agreements are finalized, so that Congress and others can consider environmental effects.

But the Supreme Court has clearly stated that judicial intervention is not proper just because the time to start work preparing an EIS has arrived. Even though § 102(2)(C) in some cases requires certain consultations before completion of the report, and obviously contemplates "a consideration of environmental factors by agencies during the evolution of a report or recommendation on a proposal", *Kleppe v. Sierra Club*, 427 U.S. 390, 406 n. 15, 96 S.Ct. 2718, 2728 n. 15, 49 L.Ed.2d 576 (1976), the time for judicial intervention is "when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement", *id.*[4] In *Kleppe*

---

**3.** The following colloquy occurred:

The Court: You're here under the APA, and the APA requires for our court to consider whatever arguments you make, that there be final agency action. And from what I understand so far in your argument, you really haven't identified that. There are negotiations going on, the Uruguay Round may complete, it may not complete; and the same with the other negotiations. So where is the final agency action that this court is to consider in terms of whether an impact statement should be prepared or not?

Counsel: The final action is the conclusion of the trade agreement.

**4.** The cases plaintiffs cite on the importance of early guidance from an EIS do not suggest that courts may enforce NEPA before the statement is due; all involved review of final agency action. See *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (reviewing adequacy of final, supplemental EIS for fully-funded dam construction project); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (NEPA challenge to Forest Service's issuance of use permit); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 453–54 (D.C.Cir.1977) (agency's submission of prospec-

the Court overturned a decision of this court that had read NEPA to require preparation of an EIS at some court-determined "point during the germination process of a potential proposal." *Id.* at 406, 96 S.Ct. at 2728. Any such doctrine, the Court said, would "invite judicial involvement in the day-to-day decisionmaking process of the agencies, ... would invite litigation, [and] would result in the preparation of a good many unnecessary impact statements." *Id.* Thus, although the holding in *Kleppe* is formally on the start of an agency's duty, the Court's statement on the timing of litigation appears equally driven by concern over values that the finality doctrine is designed to protect. See, e.g., *FTC v. Standard Oil Co.*, 449 U.S. at 242, 101 S.Ct. at 494 (noting problems of interference with the proper functioning of agencies, the burden on the courts, and the inefficiencies of piecemeal review).

In accord with *Kleppe*, courts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit. See, e.g., *Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 243–44 (10th Cir.1991) (Department of Interior's announcement of mere *intention* to exchange land suitable for coal mining for unmineable tract not reviewable final agency action); *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District*, 752 F.2d 373, 378 (9th Cir.1985) (NEPA suit challenging initial EIS prepared in connection with preliminary design and engineering work for proposed subway not final because the subway might never actually be funded or built); *National Wildlife Federation v. Goldschmidt*, 677 F.2d 259, 263–64 (2d Cir.1982) (declining to review adequacy of EISs prepared for proposed highway sections that might never be built); cf. *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1243–44 (D.C.Cir.1980) (agency inaction not reviewable).

Plaintiffs rely heavily on *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir.1986), where the Ninth Circuit held ripe

tus to congressional committees constituted pro-

a suit to enjoin the Department of Interior from submitting a report to Congress until it complied with NEPA. There, however, it was certain that the Department *would* submit the report, since it was required by statute to do so. In fact, the Department had already decided to prepare a legislative environmental impact statement to accompany the report, suggesting that it expected the report to contain a "proposal for legislation". By contrast, the President and the Trade Representative are under no legal obligation to complete the trade agreements and send them on to Congress, and we are in no position to speculate on the probability that either agreement will ever become final. Thus, the circumstances here are much closer to those in *Kleppe*, which the Ninth Circuit expressly distinguished on similar grounds:

> The congressional request for specific recommendations within a specific region distinguishes this case from *Kleppe v. Sierra Club, Inc.*, ... a case in which the Court determined that the contemplation of a project is insufficient to require an EIS under NEPA. It is also significant that here the Secretary has already agreed to submit an LEIS, thus disposing of the Court's concern in *Kleppe* that premature and unnecessary statements will be filed.

*Trustees for Alaska*, 806 F.2d at 1381 n. 5.

Plaintiffs also cite *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), in which the Court reviewed an NRC rule stating that the Commission would not prepare EISs on permanent storage of nuclear wastes in individual licensing proceedings. Cf. *National Wildlife Federation v. Hodel*, 839 F.2d 694, 712 (D.C.Cir.1988) (review of regulation delegating certain authority to states, with effect (if valid) of shunting EIS duty aside). But a *final* rule represents an agency's formal resolution of an issue that it has defined to its own satisfaction, usually after extended opportunity for public comment. As the rule is by definition binding on the agency, see, e.g., *McLouth Steel Products Corp. v.*

posal for legislation triggering NEPA).

*Thomas,* 838 F.2d 1317, 1320 (D.C.Cir. 1988), it will automatically be applied whenever the conditions for its application are present, whereas the Trade Representative's refusal to prepare EISs here leaves her entirely free to reverse herself tomorrow. Moreover, the agency's decision to invest resources in the rulemaking suggests a reasonably firm agency belief that those conditions will in fact arise, and with enough frequency to make generic resolution worthwhile. Thus a final rule is final in substance as well as form, while a simple agency assertion of refusal to do an EIS, having none of these characteristics of a final rule, is not.[5] See *Foundation on Economic Trends v. Lyng,* 943 F.2d at 85 (refusal to prepare EIS is not in itself "final agency action").

Plaintiffs also attempt to overcome the lack of finality here by arguing that the case is ripe. They claim ripeness on the grounds that (1) there are only purely legal issues (the merits of the Trade Representative's substantive reasons for believing she need not file an EIS) and (2) denial of immediate review will inflict hardship on them. Compare *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967).

▪ At the start the argument is mistaken in that plaintiffs confuse the relation between ripeness and finality. Where finality is an independent jurisdictional requirement (as here), it must be met. Even

if only purely legal issues remained—which is not really true [6]—that would not obviate the need for finality itself. See, e.g., *FTC v. Standard Oil Co.,* 449 U.S. at 239–43, 101 S.Ct. at 493–95; *Aluminum Co. of America v. United States,* 790 F.2d 938, 942 (D.C.Cir.1986) (Scalia, J.). Nor, indeed, would it establish the "fitness of the issues for judicial decision", see *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1516, for in the context of APA review that criterion of ripeness also requires final agency action, see *id.* at 149–50, 87 S.Ct. at 1516. In *Abbott* the Court found such action, as the challenge was to a final rule promulgated in a formal rulemaking. *Id.* at 149–52, 87 S.Ct. at 1515–17. Similarly, in *Better Government Ass'n v. Department of State,* 780 F.2d 86, 88 (D.C.Cir.1986), the disputed guidelines were clearly final, for they had been applied in day-to-day decisionmaking for two years and the defendant agencies had conceded that they *"govern[ ] and will continue to govern [their] decisions".* *Id.* at 93 (emphasis in original). Here, by contrast, there is only the Trade Representative's response to plaintiffs' inquiries.

▪ Second, plaintiffs' hardship claim is insufficient for any extant finality exception. Their theory is that (1) the NEPA claim might become moot before it ripens because courts would refuse to enjoin lawfully approved international agreements on

---

**5.** Plaintiffs also cite *Aberdeen & Rockfish Ry. Co. v. Students Challenging Regulatory Agency Procedures,* 422 U.S. 289, 318–19, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975), but that involved review of the ICC's final decision in a "general revenue proceeding", which all the parties agreed was a "major federal action" for NEPA purposes.

**6.** As no one knows what provisions any final agreement might contain, it is impossible to decide with any confidence whether the (hypothetical) agreement will include measures "significantly affecting the quality of the environment" in the *way* contemplated by NEPA. Many macroeconomic changes affect the environment significantly but very indirectly. For example, it has recently been argued that as low-income persons tend to buy in much smaller quantities than persons of higher income buying economy-size packages, they impose a

heavier per capita load of packaging waste. See William Rathje & Cullen Murphy, Beyond the Pail: Why We Are What We Don't Eat, Washington Post, June 28, 1992, at C1, C2. Thus if free trade leads to less poverty, as classical economic analysis suggests, it may have a significant effect on the environment. Indeed, almost any broad macroeconomic change would seem likely to affect the composition of GNP and thus the nature of environmental burdens. It is not clear, however, that all proposals tending to diminish poverty, or to spur economic growth, must be accompanied by EISs.

In addition, in the absence of any clear fix on the nature of the provisions that may be agreed upon, it is hard—probably impossible—to say whether any of them will affect plaintiffs (or their members) with enough directness to establish standing. See *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 2137–38, 119 L.Ed.2d 351 (1992).

the basis of NEPA violations, or, alternatively, (2) the claim would be reviewable only during the short fast-track period between the completion of a trade agreement and Congress's vote on whether to approve it, and if so there would not be enough time to prepare an EIS. Under either scenario trade agreements could become law without the allegedly necessary compliance with NEPA.

Both scenarios are overdrawn. First, Congress retains the power to change its rules and extend the statutory 90–day limit on its consideration of the trade agreements, 19 U.S.C. § 2191(a)(1), and can easily do so if it wishes to postpone consideration of the agreements pending preparation of an EIS. Further, the proposition that the fast-track procedures by their nature prevent a court from intervening in time to provide meaningful review lends some support to defendants' claim that NEPA is inconsistent with the fast track. Cf. *Flint Ridge Development Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) (holding NEPA inapplicable to HUD action on developer's filing under Interstate Land Sales Full Disclosure Act because 30–day time limit made it impracticable for HUD to prepare EIS); *NRDC v. NRC*, 647 F.2d 1345, 1385–86 (D.C.Cir.1981) (opinion of Robinson, J.) (NEPA inapplicable to NRC decisions on nuclear export license applications in part because of short time frame for NRC action). A procedural hardship whose likelihood is great only under assumptions that tend to undermine the plaintiffs' probability of success on the merits [7] is by no means the strongest case for relaxing the demands of finality.

Further, there is no general hardship exception to the finality requirement. As Judge Leventhal wrote, summarizing our cases:

> [A] federal court ... [may] take jurisdiction before final agency action ... only ... in a case of "clear right" such as outright violation of a clear statutory provision [citing *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) ] or violation of basic rights established by a structural flaw, and not requiring in any way a consideration of interrelated aspects of the merits....

*Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1180 (D.C.Cir.1979) (Leventhal, J., concurring) (emphasis omitted).[8] But plaintiffs do not even suggest that there is any outright violation of a clear right. See *Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*, 714 F.2d 163, 169 (D.C.Cir.1983). In what may be a variant of the "structural flaw" idea,[9] the plaintiffs suggest that *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), creates an exception where delay might prevent meaningful review later. But the analysis in *Rail Reorganization Act Cases* addressed ripeness quite independent of the APA. The Court did not mention § 704 of the APA, the finality provision we construe here—presumably because the act challenged was an act of *Congress*, which threatened plaintiffs with imminent harm redressable under the Declaratory Judgment Act. Cf. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 71 n. 15, 98 S.Ct. 2620, 2629 n. 15, 57 L.Ed.2d 595 (1978) (allowing injunctive relief against a threatened "taking" under the Declaratory Judgment Act, and noting that *Rail Reorganization Act Cases* were brought under that Act). Ac-

---

**7.** We of course express no opinion on the merits of defendants' claim that NEPA and the fast track are inconsistent.

**8.** *Michigan Public Power Agency v. FERC*, 963 F.2d 1574, 1583 (D.C.Cir.1992), suggests another exception—where in the very same case the court resolved identical claims while reviewing a clearly final action, and the substantive standards largely overlapped with the finality and ripeness inquiries. The exception has no possible application here.

**9.** In fact "structural flaw" appears not to be so much an exception to finality as a satisfaction of finality through an administrative law variation on the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949). See *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 750 (D.C.Cir.1987) (concurring opinion).

cordingly, plaintiffs' claim fits within no exception to the finality requirement.[10] And even if the hardship analysis in *Rail Reorganization Act Cases* were directly applicable, it would not support plaintiffs' argument. The Court there held that certain Fifth Amendment takings challenges to a conveyance scheme were ripe because the statutory mandate made the conveyance *inevitable;* only its precise terms were uncertain. *Id.* [419 U.S.] at 140–45, 95 S.Ct. at 357–59. Here there is uncertainty not only about the precise terms of any final agreements, but, more fundamentally, about whether there will ever be any final agreements at all. In fact, plaintiffs' NEPA claims here are more closely akin to the claims the Court held *unripe* in *Rail Reorganization Act Cases,* those related to

valuation disputes that could not be resolved until the plan had taken final form. See 419 U.S. at 146–47, 95 S.Ct. at 360.

\*    \*    \*    \*    \*    \*

As plaintiffs have failed to identify any final agency action upon which our jurisdiction under the APA could be grounded, we affirm the district court's dismissal of their claims.

*So ordered.*

---

**10.** Even if the finality requirement could be excused if a party seeking judicial review could show *both* that final agency action was certain or nearly certain and that there was *no* chance of judicial review if it were withheld until that

event, plaintiffs would not prevail here. They have not shown that it is anywhere near certain that the trade agreements will ever be completed, nor that later judicial review is precluded. See above at 921–22.