# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 8, 2006        Decided January 30, 2007

No. 06-5059

KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC.,
ET AL.,
APPELLANTS

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv01190)

———

*W. Henry Graddy,* IV., pro hac vice, argued the cause for appellants. On the briefs was *David G. Bookbinder.*

*Jennifer L. Scheller*, Attorney, U.S. Department of Justice, argued the cause for Federal Appellees. With her on the brief was *Todd S. Aagaard*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Maria V. Gillen* argued the cause for appellee Tennessee Valley Authority. With her on the brief were *Harriet A. Cooper* and *Frank H. Lancaster*.

*Robert M. Andersen* argued the cause for appellees Inter-Modal Transportation Authority, Inc., et al. With him on the brief was *D. Randall Benn*.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Seeking to halt several local governmental entities in Kentucky from developing a transit park, appellant environmental organizations sued the Environmental Protection Agency, the Department of Housing and Urban Development, and the Tennessee Valley Authority, alleging that these agencies failed to conduct the environmental and historical assessments required, respectively, by the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). Because neither EPA nor HUD engaged in "final agency action" within the meaning of section 704 of the Administrative Procedure Act—a prerequisite for both NEPA and NHPA actions against federal agencies—we affirm the district court's dismissal of the complaint against those two agencies. Although TVA did take final agency action by making a grant to a transit park tenant, because appellants have produced no evidence of continuing TVA authority over the project, we affirm the district court's dismissal of the complaint against TVA for mootness.

**I.**

"Because we review here a decision granting [a] motion to dismiss, we must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 n.1 (2002). Viewed that way, the complaint tells the following story:

In 1998, Warren County and the city of Bowling Green, Kentucky, decided to build the "Kentucky Trimodal Transpark" ("Transpark"), an $80 million 4,000-6,000 acre industrial park and transportation complex that would include, among other facilities, a new airport, a new rail hub, and extended highways. Located six miles south of Mammoth Cave National Park, the Transpark site rests on a vast karst plain—a topography characterized by sinkholes, caves, and underground streams, rivers, and groundwater. Adjacent to the site are several areas of historic significance, including the Oakland Freeport Historic District, a site listed in the National Register of Historic Places, and other Reconstruction-era African-American communities that have applied for historic status.

To develop the Transpark, the county and the city created the Inter-Modal Transportation Authority (ITA), a nonprofit corporation authorized, among other things, to apply for and receive grants from federal agencies. In 2004, ITA began construction of the first phase of the Transpark, which included an interior road, water and sewer infrastructure, technical training facilities, and a building for Bowling Green Metalforming ("Metalforming"), an automobile parts manufacturer. During the next few years, the Federal Highway Administration (FHWA) allocated $8.75 million to ITA for highway construction and expansion. FHWA then began the environmental and historical reviews required, respectively, by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and the National Historic Preservation Act, 16 U.S.C. § 470 *et seq*. NEPA requires federal agencies to prepare an environmental impact statement (EIS), which assesses a project's environmental impact and identifies alternatives, for all proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NHPA requires that before funding or licensing a "[f]ederal or federally assisted undertaking," federal agencies must (1) "take

into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register," and (2) "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f.

Other federal agencies also became involved. The Federal Aviation Administration, which must approve the closing of the existing airport (because it provided substantial funding for its construction), studied the feasibility of replacing the old airport with a new one. Congress appropriated $3.75 million for EPA to spend on water and sewer infrastructure, and another $1.75 million for HUD to spend on a training center. And TVA, pursuant to the "Valley Advantage" contract, awarded $500,000 to Metalforming for the installation of electrical equipment.

Concerned about the Transpark's impact on Mammoth Cave's ecosystem, the karst plain's underground water sources, and the nearby historic sites, Appellants Karst Environmental Education and Protection and Warren County Citizens for Managed Growth, along with some of their board members (throughout this opinion, we refer to appellants collectively as "Karst") filed a complaint alleging that EPA, HUD, and TVA all violated both NEPA and NHPA by failing to conduct the required environmental and historical reviews. ITA, Warren County, and Bowling Green moved to intervene as defendants ("local intervenors"), in response to which Karst filed an amended complaint adding allegations against all three and asking the court to "halt[] all demolition and construction of the Transpark until NEPA and NHPA have been fully complied with." Am. Compl. 27.

The district court granted EPA and HUD's joint motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "[F]or a court to have

jurisdiction over claims seeking judicial review," the district court explained, "it must determine that the action is final." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 80 (D.D.C. 2005). The court found that HUD took no final agency action because it had yet to act on local intervenors' grant application. *Id.* at 81. Because the district court concluded that local intervenors' request for EPA advice on the Transpark did not amount to a major federal action that would trigger NEPA, it never determined whether EPA engaged in final agency action. *Id.* at 80-81 ("'[T]he power to give nonbinding advice to a nonfederal actor' does not constitute a major federal action." (quoting *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1482 (10th Cir. 1990))). The court dismissed Karst's claims against TVA as moot because "the action complained of"—TVA's $500,000 grant to Metalforming—"has been completed and no effective relief is available." *Id.* at 82. Without separate analysis, the district court also granted local intervenors' motion to dismiss. *Id.* at 76 n.1, 82-83. Karst appeals.

**II.**

Before considering the merits, we must determine whether Karst has Article III standing. *See Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 94-102 (1998) (holding that federal courts must ensure that they have jurisdiction before considering the merits of a case). The "irreducible constitutional minimum of standing" consists of three elements: (1) an "injury in fact" that is (2) "fairly . . . trace[able] to the challenged action of the defendant," and (3) "likely . . . redress[able] by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (first alteration in original, internal quotations marks and citations omitted). EPA and HUD argue that Karst fails to satisfy the latter two requirements because nothing in the complaint alleges that the two agencies injured Karst by either

funding or approving the Transpark. It follows, the two agencies argue, that Karst's injuries from the Transpark development are not redressable.

Contrary to this argument, however, Karst *does* allege funding by both EPA and HUD—specifically that the Transpark "has already benefited from, and is based on, pervasive federal action in the form of financial assistance from EPA, HUD, and TVA," Am. Compl. 12, and that "a portion of the funding for . . . construction [of the first phase of the Transpark] was federal funding from one or more of the [d]efendants," *id.* at 15. Assuming the truth of these claims and that Karst will succeed on the merits, as we must for purposes of standing, *see City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."), these allegations suffice to establish both causation and redressability. Accordingly, we turn to the merits.

As indicated above, the district court dismissed the case against HUD because it took no "final agency action" and against EPA because it took no "major federal action." *Karst*, 403 F. Supp. 2d at 80-81. The district court's decision is unassailable. Relying on the Supreme Court's holding in *Lujan v. National Wildlife Federation*, 492 U.S. 871 (1990), that "person[s] claiming a right to sue [under NEPA] must identify some 'agency action' that [adversely] affects [them]," *id.* at 882, we suggested in *Public Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992) ("*Public Citizen I*"), and later held in *Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993) ("*Public Citizen II*"), that because NEPA creates no private right of action, challenges to agency compliance with the statute must be

brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, which requires "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. In *San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005), the Ninth Circuit reached the same conclusion with respect to NHPA, explaining that because the statute creates no private right of action, plaintiffs must file NHPA claims pursuant to the APA. *Id.* at 1099. Because in *Public Citizen I* and *II* we relied on *Lujan v. National Wildlife Federation* to hold that NEPA actions must be brought under the APA, and because NHPA, like NEPA, contains no private right of action, we agree with the Ninth Circuit that NHPA actions must also be brought pursuant to the APA.

In the NEPA context, the "final agency action" required by the APA must also be a "major federal action" under NEPA. *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991). Because of the "operational similarity" between NEPA and NHPA, both of which impose procedural obligations on federal agencies after a certain threshold of federal involvement, courts treat "major federal actions" under NEPA similarly to "federal undertakings" under NHPA. *See Sac and Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263 (10th Cir. 2001); *San Carlos Apache Tribe*, 417 F.3d at 1097. Thus, just as the "final agency action" in a NEPA claim must be a "major federal action," the "final agency action" in an NHPA claim must be a "federal undertaking."

On appeal, Karst does not argue that either EPA or HUD engaged in final agency action. Instead, it maintains that it had no need to establish final agency action because "the cumulative substantial involvement of federal agencies in the Transpark federalized the project from its inception." Appellants' Br. 25. Even though the federal government is not the Transpark's primary developer, Karst alleges, the project enjoys sufficient

federal involvement to subject EPA, HUD, and TVA to NEPA and NHPA requirements.  Based on this federal involvement, Karst argues that:

> The funding, permitting and construction of the Transpark project is a "major federal action . . ." within the meaning of . . . NEPA . . . . But for the federal funding available from and/or provided by EPA, FAA, FHWA, HUD, TVA, and other sources, no part of the Transpark activities which are the subject of this complaint would have been undertaken.  The actions taking place at the Transpark that are the subject of this Complaint are thus final agency action for purposes of the APA.

Am. Compl. 25.  Because of this, Karst claims, "[d]efendants have violated NEPA by failing to prepare an Environmental Impact Statement for the entire Transpark." *Id.* at 26.  Similarly, Karst alleges that the three agencies, by failing to conduct a historical review of the Transpark, violated NHPA because "EPA, HUD and TVA jurisdiction over the project requires compliance with Section 106 of NHPA prior to agency funding or approval of any aspect of the project." *Id.* at 21.

Karst bases its "federalization" claim on two cases, *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986), and *Macht v. Skinner*, 916 F.2d 13 (D.C. Cir. 1990). In *Gilchrist*, an environmental organization challenged a local government's plan to construct a highway, part of which would cross a state park and would thus likely require approval from several federal agencies, including the Interior Department, which had substantially funded the park.  808 F.2d at 1042. Under these circumstances, the court concluded, the highway amounted to a major federal action that triggered NEPA's EIS

requirement because "a non-federal project is considered a federal action if it cannot begin or continue without prior approval of a federal agency." *Id.* (internal quotation marks omitted). The court explained its reasoning as follows:

> The decision of the Secretary of the Interior to approve the project, and the decision of any other Secretary whose authority may extend to the project, would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS. The completed segments would stand like gun barrels pointing into the heartland of the park. . . . It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent. Non-federal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli*.

*Id.* (internal quotation marks and citation omitted).

In *Macht*, which involved a challenge to Maryland's construction of a light rail line that would have required a wetlands permit from the Army Corps of Engineers, we cited *Gilchrist* with approval, observing that "[t]he reasoning of the Fourth Circuit in *Gilchrist* is sound: the state may not begin construction of any part of a project if the effect of such construction would be to limit significantly the options of the federal officials who have discretion over substantial portions of the project." *Id.* at 19. That said, we limited the federalization theory to situations of "substantial" federal involvement. *Id.* Applying that standard to the light rail project, we found insufficient evidence of federal involvement because federal agencies had discretion over "only a negligible portion of the

entire project," as compared to *Gilchrist*, "where several agencies had discretion over a *substantial* part of the highway project." *Id.* (emphasis added, internal quotation marks omitted).

Relying on *Gilchrist* and *Macht*, Karst argues it has no need to demonstrate "final agency action" pursuant to the APA. According to Karst, "it is the construction activity by the non-federal 'partner' with the federal government in their 'joint venture' or such action by the non-federal entity that will face the 'inevitable exercise of federal approval power' that triggers APA jurisdiction over federal agencies." Appellants' Reply Br. 3-4.

Karst's argument suffers from two defects which, in combination, are fatal to its case. First, given that *Macht* found insufficient federal involvement to trigger NEPA, its statement that "[t]he reasoning of the Fourth Circuit in *Gilchrist* is sound" is dictum. Thus, unlike the Fourth Circuit, we have no binding precedent adopting the federalization theory. Second, and even more important, at the time *Gilchrist* and *Macht* were decided, in 1986 and 1990, respectively, we had not yet held in *Public Citizen I* and *II* that NEPA claims must be brought pursuant to the APA and must therefore allege "final agency action." *See Public Citizen II*, 5 F.3d at 551; *Public Citizen I*, 970 F.2d at 918. Indeed, then-existing case law suggested that NEPA itself created a private right of action. For example, in *Aberdeen & Rockfish Railroad Co. v. Students Challenging Regulatory Agency Procedures*, 422 U.S. 289 (1975) ("*SCRAP II*"), the Supreme Court suggested, in its first effort to interpret NEPA, that claims under the statute might be brought independently of the APA: "NEPA does create a discrete procedural obligation on Government agencies . . . and a right of action in adversely affected parties to enforce that obligation." *Id.* at 319. Prior to *Macht*, we too decided several NEPA cases without mentioning

either final agency action or the APA. *See, e.g.*, *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883 (D.C. Cir. 1981); *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971). To be sure, the Supreme Court issued *Lujan v. National Wildlife Federation* four months prior to our decision in *Macht*, but because the parties in *Lujan* failed to argue the issue, the Supreme Court left open the question of whether NEPA contains a private right of action. *Lujan*, 497 U.S. at 882.

Thus, although the federalization theory may have had merit when we decided *Macht*, it lacks vitality today given our decisions in *Public Citizen I* and *II*, as well as our subsequent decisions reiterating the requirement that NEPA claims must be brought under the APA and allege final agency action. *See, e.g.*, *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006); *Tulare County v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc). Because Karst has failed to allege that either EPA or HUD engaged in final agency action, we shall affirm the district court's dismissal of the complaint against those two agencies. Although the district court dismissed the case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) rather than, as it should have, for failure to state a claim under Rule 12(b)(6), "we [can] nonetheless affirm the dismissal if dismissal [is] otherwise proper based on failure to state a claim under [Rule] 12(b)(6)." *EEOC v. St. Francis Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *see Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006) (explaining that "the APA's final agency action requirement is not jurisdictional"). And because nothing in the APA authorizes claims against nonfederal entities, *see* 5 U.S.C. § 702 (authorizing judicial review of "agency action"); 5 U.S.C. § 701(b)(1) (defining an "agency" as "each authority of the Government of the United States"); *see, e.g.*, *Sw. Williamson*

*County Cmty. Ass'n v. Slater*, 173 F.3d 1033, 1035 (6th Cir. 1999) ("By its own terms, the APA does not apply to state agencies."), we shall affirm the district court's dismissal of the complaint against local intervenors.

The remaining defendant, TVA, did undertake final agency action by making the $500,000 grant to Metalforming. But the district court, noting that TVA had awarded the grant in 2004, months before Karst filed its complaint, concluded that "[a] claim that the defendants violated . . . NEPA is moot when the action complained of has been completed and no effective relief is available." *Karst*, 403 F. Supp. 2d at 82. Responding to Karst's argument that the injury was capable of repetition yet evading review because TVA might award future grants to Transpark tenants, the district court explained that Karst's claim was moot *when filed* and that "the mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced." *Id.* (quoting *Renne v. Geary*, 501 U.S. 312, 320 (1991)).

Karst insists that effective relief remains available because TVA can impose measures on Metalforming to mitigate any environmental harm caused by the electrical equipment paid for by the agency's grant. *See Vieux Carre Prop. Owners, Residents, & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446 (5th Cir. 1991) (holding that a suit challenging a federally funded project that has been completed is moot "only if [the agency] presents evidence that compliance with the historical review process . . . could not minimize *any* of the adverse effects on [plaintiffs]"). Although TVA explains that it "simply has no authority under the grant or under any statute to perform the ongoing mitigation measures that Appellants suggest would make this a live controversy," Appellee TVA's Br. 18, Karst implies that the TVA Valley Advantage contract may give the

agency authority to impose such mitigation measures. We say "implies" because, according to Karst, since the contract is not part of the record and TVA failed to supply it in response to a FOIA request, "[it] do[es] not know whether there are terms and conditions of the agreement itself that provide an independent contractual re-opener." Appellants' Reply Br. 22.

If TVA actually has authority—whether by statute, regulation, contract, or otherwise—to impose mitigation measures upon Metalforming, Karst's claim might well remain justiciable. *See Vieux Carre*, 948 F.2d at 1446. But Karst's complaint does not allege that TVA has such authority; indeed, the complaint never even mentions the Valley Advantage contract. Although Karst suggested in a memorandum supporting its opposition to the motion to dismiss that TVA could impose mitigation measures on Metalforming, it failed to identify any basis for such remediation, stating only that the district court "should redress the TVA . . . violations . . . by investigating the terms of the grant to . . . Metalforming to determine if TVA has imposed or can impose any environmental mitigation measures on the recipient of TVA funds." Mem. in Support of Resp. to Mot. to Dismiss 39. We need not decide whether this was sufficient to raise the issue, for Karst has forfeited the argument on appeal. Although Karst referred to the Valley Advantage contract in its opening brief, not until its reply brief did it mention its inability to obtain a copy of the contract or argue that the contract provides a basis for remediation. This was too late, *see PDK Labs, Inc. v. U.S. Drug Enforcement Admin.*, 438 F.3d 1184, 1196 (D.C. Cir. 2006) (explaining that reference in opening brief to factual basis for an argument not raised until reply brief does not properly raise the argument), as was its vague assertion, also in its reply brief, that "TVA's NEPA procedures and the applicable rules suggest that TVA may be able to exercise its authority over some ongoing and completed projects." Appellants' Reply Br. 21. *See Rollins*

*Envtl. Servs. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").

## III.

For the reasons given above, we affirm the district court's dismissal of the complaint as to all defendants.

*So ordered.*